UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————— x

RICHARD CIRAMI,

                                    Plaintiff,

                    -against-

GARY DEAR,

                                    Defendant.

———————————————————————— x

CV 04 2359

2004 Civ. _____

COMPLAINT

RECEIVED
U.S. DISTRICT COURT, E.D.N.Y.
IN CLERK'S OFFICE
LONG ISLAND COURTHOUSE

★ JUN 0 8 2004 ★

ENTERED

FEUERSTEIN, S

WALL, M.J.

Plaintiff, Richard Cirami ("Cirami"), by his attorney, Roy A. Klein, for his complaint

against defendant, Gary Dear ("Dear"), alleges on information and belief as follows:

## NATURE OF ACTION

1. This action arises out of an agreement between Cirami and Dear to purchase

automobile dealerships.  Although the parties entered into contracts to purchase two such

dealerships, Dear inexplicably declined to go forward with the deals, in breach of his agreement

with Cirami.  Dear then made defamatory statements about Cirami to persons within the

automobile industry and to law enforcement officials.  Dear's conduct deprived Cirami of the

benefits of the parties' agreement and seriously injured Cirami's reputation within the automobile

industry.  Cirami seeks compensatory and punitive damages against Dear for breach of contract,

breach of fiduciary duty, promissory estoppel, fraud, defamation and tortious interference.

## PARTIES, JURISDICTION AND VENUE

2. Cirami resides at 339 Mill River Road, Oyster Bay, within the Eastern District of New

York.

3. On information and belief, Dear resides at 1 Independence Court, Hoboken, New Jersey, within the District of New Jersey.

4. The Court possesses subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). Damages, exclusive of interest and costs, are in excess of $75,000.

5. A substantial part of the events giving rise to Cirami's claims occurred in the Eastern District of New York.

6. Venue lies in this District pursuant to 28 U.S.C. § 1391.

## FACTUAL BACKGROUND

7. Cirami has nearly 30 years of experience and success in the automobile business industry (the "Industry"), including as: (a) General Manager for Star Leasing Wheels, Inc.; (b) General Sales Manager for the Paulson Automotive Group in Beverly Hills, California; (c) Vice President of Subaru of New England; and (d) General Sales Manager for the Rodeo Group, Inc., in Los Angeles. As a result of this experience, Cirami has the expertise to operate automobile dealerships profitably. He has also developed valuable contacts within the Industry.

8. In early 2004, Dear approached Cirami with a proposal for a business arrangement whereby Cirami would identify automobile dealerships for purchase. Under the arrangement, Dear would furnish capital to purchase the dealerships and Cirami would be given an ownership interest in the purchasing entities

9. The parties memorialized this arrangement in an agreement dated March 12, 2004, a copy of which is annexed hereto as Exhibit A and incorporated herein by reference (the "Agreement"). Thereafter, by addendum executed by Gary Dear on March 14, 2004, Dear agreed

2

that:

> Richard Cirami will be paid a salary of $250,000 per year and stock options will be determined once we purchase a dealership. Compensation will be from March 1, 2004 and guaranteed for the next ninety days. All expenses will be paid by Gary Dear for Richard Cirami.

A copy of the addendum is annexed hereto as Exhibit B (the "Addendum").

10. Pursuant to the Agreement and the Addendum, Cirami devoted substantial time and effort to identifying appropriate automobile dealerships for purchase and to negotiating the terms of such purchases.

11. By Agreement To Purchase and Sell signed by Cirami and Dear on April 9, 2004, Cirami and Dear agreed to purchase Island Ford-Lincoln-Mercury, a dealership located just outside Hilton Head, South Carolina. A copy of this agreement (the "South Carolina Purchase Agreement") is annexed hereto as Exhibit C.

12. By Asset Purchase Agreement executed by Cirami and Dear and dated April 24, 2004, Cirami and Dear agreed to purchase a KIA dealership in Naples, Florida. A copy of this Agreement (the "Florida Purchase Agreement") is annexed hereto as Exhibit D.

13. Despite executing the South Carolina Purchase Agreement and the Florida Purchase Agreement, however, Dear declined to go forward with either transaction and failed and refused to furnish the financing promised to close either deal.

14. On or about May 1, 2004, Cirami advised Dear that he was a taking a portion of the returned $100,000 deposit paid pursuant to the Florida Purchase Agreement to reimburse himself for salary and expenses owed in accordance with the Addendum. By an April 8, 2004 Agreement For Cash Disbursements, a copy of which is annexed hereto as Exhibit E, Dear had given Cirami

3

"full authority to move funds from any account where we have put a deposit to any other account."

## FIRST CLAIM
### (For Breach of Contract)

15.  Cirami repeats each and every allegation set forth at paragraphs 1-14 above.

16.  Paragraph 3 of the parties' March 12, 2004 Agreement provided that, upon Cirami presenting a dealership opportunity to Dear during the first 120 days after the Agreement's execution, Dear was required to "timely make a determination, at his sole discretion, about his desire to finance the dealership or arrange financing for the dealership . . . ."

17.  Dear stated an intent to finance or arrange financing for the South Carolina and Florida transactions by executing the South Carolina Purchase Agreement and the Florida Purchase Agreement.

18.  Dear breached his Agreement with Cirami by failing and refusing to provide financing for either the South Carolina or Florida transaction, instead pulling out of both transactions.

19.  Cirami has been damaged by Dear's breaches as follows:

4

(a) Cirami has been deprived of the $250,000 annual salary and stock options he would have received under the Addendum.

(b) Cirami has lost the profits he would have realized from participating in the operation of the purchased dealerships.

(c) Cirami's reputation in the Industry has been damaged, which was a foreseeable consequence of Dear's breaches.

20. Cirami has performed all obligations required of him under the Agreement.

21. By reason of the foregoing, Cirami is entitled to damages in an amount to be determined at trial of at least $1,000,000.

## SECOND CLAIM
### (For Breach of Fiduciary Duties)

22. Cirami repeats each and every allegation set forth at paragraphs 1-15 above.

23. In connection with their possible acquisitions of automobile dealerships, Dear owed Cirami fiduciary duties of undivided loyalty, good faith and fair dealing.

24. Dear breached his fiduciary duties to Cirami by failing and refusing to provide financing for either the South Carolina or Florida transaction, instead pulling out of both transactions.

25.  Cirami has been damaged by Dear's breaches of fiduciary duties as follows:

(a) Cirami has been deprived of the $250,000 annual salary and stock options he would have received under the Addendum.

(b) Cirami has lost the profits he would have realized from participating in the operation of the purchased dealerships.

(c) Cirami's reputation in the Industry has been damaged, which was a foreseeable consequence of Dear's breaches.

26.  By reason of the foregoing, Cirami is entitled to damages in an amount to be determined at trial of at least $1,000,000.

### THIRD CLAIM
### (For Promissory Estoppel)

27.  Cirami repeats each and every allegation set forth at paragraphs 1-15 above.

28.  Dear promised Cirami that, in exchange for identifying appropriate automobile dealerships for purchase, Dear would provide the financing for such purchases and pay Cirami a salary of $250,000 per year, and Cirami would share in the profits of the purchased dealerships.

29.  Cirami reasonably relied on Dear's promises by incurring time, expense and effort to identify appropriate dealerships for purchase and by negotiating the terms of purchase for the South Carolina and Florida dealerships.

30.  Cirami's reliance was solely referable to Dear's promises.

31.  Dear's promises were false in that he failed and refused to provide financing for either the South Carolina or Florida transaction, instead pulling out of both transactions.

6

32. Cirami has been damaged by Dear's breaches of his promises as follows:

    (a) Cirami has been deprived of the $250,000 annual salary and stock options he would have received under the Addendum.

    (b) Cirami has lost the profits he would have realized from participating in the operation of the purchased dealerships.

    (c) Cirami's reputation in the Industry has been damaged, which was a foreseeable consequence of Dear's failure to keep his promises.

33. It would be unconscionable for Dear to deny his promises, and he should be promissorily estopped from doing so.

34. By reason of the foregoing, Cirami is entitled to damages in an amount to be determined at trial of at least $1,000,000.

## FOURTH CLAIM
### (For Fraud)

35. Cirami repeats each and every allegation set forth at paragraphs 1-15 above.

36. Dear represented to Cirami that, in exchange for identifying appropriate automobile dealerships for purchase, Dear would provide the financing for such purchases and pay Cirami a salary of $250,000 per year, and Cirami would share in the profits of the purchased dealerships.

37. Cirami reasonably relied on Dear's representations of fact by incurring time, expense and effort to identify appropriate dealerships for purchase and by negotiating the terms of purchase for the South Carolina and Florida dealerships.

38. Cirami would not have taken these actions but for Dear's representations of fact, which were material.

7

39.  Dear's representations were false in that, when he made them, he never intended to provide financing for either the South Carolina or Florida transaction

40.  Cirami neither knew nor had reason to know that Dear's representations were false.

41.  Cirami has been damaged by Dear's material misrepresentations of fact as follows:

(a) Cirami has been deprived of the $250,000 annual salary and stock options he would have received under the Addendum.

(b) Cirami has lost the profits he would have realized from participating in the operation of the purchased dealerships.

(c) Cirami's reputation in the Industry has been damaged, which was a foreseeable consequence of Dear's misrepresentations.

42.  By reason of the foregoing, Cirami is entitled to damages in an amount to be determined at trial of at least $1,000,000.

43.  In addition, Dear's tortious conduct was so egregious that Cirami should be awarded punitive damages of $1,000,000.

### FIFTH CLAIM
### (For Defamation)

44. Cirami repeats each and every allegation set forth at paragraphs 1-15 above.

45.  On information and belief, in or about late April and May, 2004, Dear published to various individuals in the Industry, agents of the FBI and New York law enforcement officials words to the following effect: that Cirami had stolen $100,000 from Dear by unlawfully diverting to himself the returned deposit that had been paid under the Florida Purchase Agreement.

46.  This statement was false because Cirami had told Dear that he was retaining a portion

8

of the $100,000 to reimburse himself for unpaid salary and expenses, in accordance with the

parties' April 8, 2004 Agreement For Cash Disbursements

47. Dear's statements were defamatory *per se* because they injured Cirami in his

profession.

48. Dear's statements also caused Cirami special damages in that he has been unable to

obtain employment or do business in the Industry as a result of Dear's statement, resulting in lost

income, lost earnings and lost business opportunities.

49. By reason of the foregoing, Cirami is entitled to $1,000,000 in special damages and

$1,000,000 in general damages.

## SIXTH CLAIM
### (For Tortious Interference)

50. Cirami repeats each and every allegation set forth at paragraphs 1-15 and 45-48 above.

51. Cirami had numerous business relationships and advantageous business opportunities

in the Industry by reason of his 30-year career in such Industry.

52. Dear knew about Cirami's business relationships and opportunities.

53. In or about late April and May, 2004, Dear intentionally interfered with Cirami's

business relationships and opportunities by falsely telling individuals in the Industry that Cirami

had stolen $100,000 from Dear by unlawfully diverting to himself the returned deposit that had

been paid under the Florida Purchase Agreement.

54. Cirami was damaged by Dear's tortious interference in that he has been unable to

obtain employment or do business in the Industry as a result of Dear's statements, resulting in lost

income, lost earnings and lost business opportunities.

9

55. By reason of the foregoing, Cirami is entitled to $1,000,000 in damages.

56. In addition, Dear's tortious conduct was so egregious that Cirami should be awarded punitive damages of $1,000,000.

WHEREFORE, Cirami respectfully requests that this Court grant to him judgment containing the following relief:

(a) An award to Cirami of his actual and/or special damages in an amount to be determined at trial, but not less than $1,000,000;

(b) An award to Cirami of punitive and/or general damages of $1,000,000;

(c) An award to Cirami of pre-judgment interest;

(d) An award to Cirami of the costs of this action, together with his reasonable attorneys' fees; and

(e) Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Cirami hereby demands a trial by jury of all issues so triable.

Dated: Melville, New York
June 8, 2004

Respectfully submitted,

Roy A. Klein (RAK-9850)
Attorney for Plaintiff
532 Broad Hollow Road
Suite 144
Melville, NY 11747
(631) 777-1313

10

# EXHIBIT A

## AGREEMENT

## INVESTIGATION OF ESTABLISHMENT OF NEW CAR FRANCHISES

AGREEMENT made this 12th day of <u>March, 2004</u> by and between Richard Cirami (hereinafter "Cirami") and Gary Dear (hereinafter "Dear").

### Recitals

WHEREAS, Cirami and Dear intend to inquire about the possibility of establishing and obtaining franchise rights to establish new franchises or purchase existing franchises for the operation of new car dealerships for brands/companies, including, but not limited to Ferrari, Maserati, Alfa Romeo, and Hummer; and

WHEREAS, following inquiry, the parties intend to commence business, consisting of new car sales, on behalf of the franchises/companies contacted in the previous recitation (hereinafter the "Business Purpose"); and

WHEREAS, Dear has the abilities to finance and/or obtain financing which is necessary to carry out and further the Business Purpose; and

WHEREAS, Cirami, has the experience and business relationships necessary to obtain the franchises necessary to further the Business Purpose; and

WHEREAS, Cirami represents that he has already been accepted as a dealer principal by Ferrari, Maserati, Alfa Romeo, and Hummer, and requires the submittal of appropriate financial documentation to be assigned a factory franchise; and

WHEREAS, upon receipt of the franchise or right to commence operations as a new car dealership for any motor vehicle manufacturer, a company will be established, subject to separate agreements, including ownership stakes of Dear (not be less than 50%), Cirami,(10%) Charles Toepfer (hereinafter "Toepfer"), and(10%) John Cristen (hereinafter "Cristen").  The ownership stake of Cirami in the yet to be formed company will not exceed 30 percent, but will be based upon a yet to be determined payment scale based on the earnings of the yet to be formed company (This yet to be formed company will hereinafter be referred to as the "Company"); and

WHEREAS, the parties enter into this agreement to establish the intent of the parties in moving forward;

NOW, THEREFORE, in consideration of the mutual covenants set forth below,

the Recitals (which are a substantive part of this Agreement) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, hereby agree as follows:

1.   The full sum of Ten Thousand Five Hundred Dollars ($10,500) will be paid by Dear to Cirami upon execution of this Agreement by all parties.

2.   Cirami agrees to use his full time and best efforts to make inquiry and contact with motor vehicle manufacturers, especially, but not limited to Ferrari, Maserati, Alfa Romeo, and Hummer, with the intention of establishing businesses for the sale of their new vehicles in dealerships owned and managed by a company to be later established as set forth in the recitals hereto.  Said company to be comprised of Dear, Cirami, Toepfer and Cristen.

3.   Any dealership opportunities that are presented to Cirami must be solely and exclusively presented to Dear, in writing, during the first 120 days after this Agreement is executed who will timely make a determination, at his sole discretion, about his desire to finance the dealership or arrange financing for the dealership subject to any proposed franchise agreement proposed by the motor vehicle manufacturer.  At no time during the 120 day period after this Agreement is executed may Cirami discuss any details of any dealership opportunities with anyone other than Dear for any purpose.

4.   After 120 days from the date this Agreement is executed, Dear shall have the first option to determine, at his sole discretion, his desire to finance or obtain financing for the dealership proposed.  Said determination shall be made by Dear within 10 days of presentation in writing.  If such determination by Dear is to reject the dealership proposal, and it is past 120 days from the signing of this Agreement, Cirami, may present the opportunity to other third parties.

5.   Upon request, Dear will timely submit any and all financial disclosures, forms, and information to Cirami which is requested and necessary to obtain an offer of a new car dealership as discussed in greater detain herein above.  If Dear provides his financial information as requested during the first 120 days after this Agreement is executed, and these financials are not approved by an automobile manufacturer due to the financial abilities represented by Dear, and not because documents are missing, Cirami will be allowed to pursue other financing opportunities.  If documents are missing, Dear shall have all opportunities to fully complete the

documentation process until such time as any determination is made due to Dear's financial abilities. After the 120 day period, refer to paragraph 4 above.

6.    Upon acceptance of Dear's financials and the granting of a franchise to Cirami, Cirami agrees not to enter into any negotiations or discussions to acquire or participate in any new or used car franchise that does not have the participation of Dear.

7.    The parties agree to incorporate these Agreed terms into any later contract which will be negotiated in greater detail between the parties.

8.    This written Agreement:

(a)    Supersedes any prior understandings or agreements between the parties relating to this subject matter;

(b)    Constitutes the entire understanding between the parties relating to this subject matter;

(c)    may be modified only in writing signed by the parties;

(d)    binds and inures to the benefit of successors and assigns of the parties;

(e)    is not assignable;

(f)    is governed by the law of the State of Florida.

9.    The parties acknowledge that neither of them has made any representations with respect to the subject matter of this Agreement nor any representations including its execution and delivery except such representations as are specifically set forth, and each of the parties hereto acknowledges that they have relied upon his own judgment in entering into the Agreement. The parties further acknowledge that any statements or representations that may have been made to this date by either of them to the other are void and of no effect and that neither of them has relied on them in connection with his dealings with the other.

10.    If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions nevertheless shall continue in full force and effect.

11.    No delay or omission by a party in exercising any rights, remedy, or power hereunder or existing at law or in equity shall be construed as a waiver thereof, and any such right, remedy, or power may be exercised from time to time and as often as may be deemed expedient or necessary in that parties sole discretion.

IN WITNESS WHEREOF, the parties have executed this Agreement in several counterparts (each of which shall constitute an original) as of the day and year first above written.


_____                    _____
Gary Dear                                     Richard Cirami

# EXHIBIT B

ADDENDUM TO AGREEMENT SIGNED FOR EMPLOYMENT CONTRACT DATED MARCH 12, 2004

RICHARD CIRAMI WILL BE PAID A SALARY OF $250,000 PER YEAR AND STOCK OPTIONS WILL BE DETERMINED ONCE WE PURCHASE A DEALERSHIP. COMPENSATION WILL BE FROM MARCH 1, 2004 AND GUARANTEED FOR THE NEXT NINETY DAYS. ALL EXPENSES WILL BE PAID BY GARY DEARFOR RICHARD CRIAMI.

AGREED TO GARY DEAR

MARCH 14, 2004

# EXHIBIT C

# ASSET PURCHASE AGREEMENT

THIS AGREEMENT is made and entered into the 24 day of April    (the "Effective Date") by and among Auto Negotiators, Inc., a Florida corporation ( the "*Seller*"),    J-D-M Realty,. Inc., a Florida corporation ("J-D-M") and                    an individual resident of the Richard Cirami - Gary Dean.                                shall hereinafter be referred to as the "*Buyer*").

## WITNESSETH:

WHEREAS, Seller is a franchise dealer and owner operator of KIA Motors America ("KIA") presently operating a new and used motor vehicle sales and service business (the "KIA Franchise") at 1472 Airport Road South, Naples, Florida (hereinafter referred to as the "Dealership"); and,

WHEREAS, Buyer desires to purchase, receive, accept and acquire certain of the assets of the Seller, including the KIA Franchise and the right to operate the Dealership upon the terms and conditions herein set forth, and Seller desires to sell, assign, transfer, and convey the same to Buyer upon such terms and conditions, and solely and exclusively to said Buyer; and,

WHEREAS, the real estate upon which the Dealership is located is owned by J-D-M and Buyer desires, and will require as part of this Agreement, to purchase the real estate and all improvements thereon free and clear of liens, claims and encumbrances.

NOW, THEREFORE, for the reasons set forth above, and in consideration of the mutual covenants herein contained, and for other good and valuable consideration, the parties agree, intending to be legally bound, as follows:

## SECTION I
## ASSETS TO BE PURCHASED

**1.1     Description of Assets.**  Subject to the terms and conditions herein set forth, Buyer agrees to purchase, receive, accept and acquire from Seller and J-D-M and Seller and J-D-M agree to sell, transfer, assign and convey to Buyer certain of Seller's and J-D-M's assets (the "Purchased Assets" or "Assets") including, but not limited to, the following:

(a)     The KIA Franchise. All of Seller's rights, title and interest in and to the KIA Franchise for Collier County, Florida, subject to the approval and consent of KIA;

(b)  <u>Real Property</u>. All of J-D-M's interest in real property and rights related thereto, including, without limitation, all land, interest in existing permits, signage, easements, licenses, rights-of-way, water, water rights, minerals, mineral rights, water and sewer taps, development rights and benefits, development credits or other rights, buildings and any transferable warranties relating to the building (e.g. roof and/or A/C), structures, fixtures, and improvements situated on, appurtenant to or inuring to the benefit of the real property located at 1472 Airport Road South, Naples, Florida, including, without limitation, the showrooms and service bays (the "Real Property"), as is more fully described in Schedule A entitled "Real Property", annexed hereto and made a part hereof;

(c)  All KIA new car, truck inventory, and KIA demonstration vehicles;

(d)  All KIA parts and accessories ("P&A"), except those returned by Seller to KIA for obsolescence prior to Closing;

(e)  All machinery, equipment, furniture and fixtures as listed in Schedule B, attached hereto and made a part hereof;

(f)  All KIA customer records and files maintained by Seller;

(g)  All intangible assets, including, but not limited to, copyrights, trademark and tradename rights relating to the KIA Franchise; and,

(h)  All of Seller's right, title and interest in any leases or loan agreements relating to assets used in the operation of the business which are listed on Schedule C attached hereto and made a part hereof, but only to the extent: (i) listed on Schedule C, and, (ii) approved by the subject lessor or lender, in writing. At Closing, Seller shall provide an assignment of the leases and/or loan agreements to be assumed by Buyer pursuant to Schedule C in a form acceptable to Buyer.

**1.2**  <u>**Consents and Lien Releases**</u>. Certain of the Personal Property included within the Purchased Assets may be non-transferable to Buyer without the consent of some other entity that may also claim some lien or other interest in such items of Personal Property. The Seller shall obtain any consent required for such transfer and the release of any lien claimed by such entity prior to closing.

**1.3**  <u>**Retained Assets**</u>. The Seller shall retain all right, title and interest to all of its assets, other than the Purchased Assets specifically identified hereinabove. Moreover, the following assets owned by Seller are specifically excluded from the Purchased Assets to be sold by Seller to Buyer:

(a)  Cash;

(b)  Accounts receivable;

(c)    Seller insurance policies regarding the Company and its business;

(d)    All machinery, equipment, furniture and fixtures owned by Seller and not listed on Schedule B;

(e)    All intangible assets owned by Seller and not specifically pertaining to the KIA Franchise, including, but not limited to, the Seller's right, title, and interest in and to the name Auto Negotiators; and

**1.4    Consignment**. Seller covenants and represents that none of the Purchased Assets were obtained by Seller on a consignment basis.

**1.5    Assignment of Leases.** Seller and Buyer shall cooperate to have the leases set forth on Schedule 1.5 attached hereto and made a part hereof (the "Leases") assigned to Buyer and Buyer agrees to assume the obligations under the Leases from and after the Closing.

# SECTION II
# CONSIDERATION AND PAYMENT

**2.1    Consideration and Payment**. The amount of the consideration and the payment terms thereof shall be as follows:

(a)    Total Consideration. The total purchase price for the assets listed in Paragraphs (a), (b), (d), (e), (f), (g), and (h) of Section 1.1 _Seven Million Dollars_ adjusted as provided for in Paragraph (b) of this Section 2.1 ; in addition, the purchase price of the assets listed in Paragraph (c) of Section 1.1 shall be the New Vehicle Inventory Amount, as determined in accordance with Pagraph (e) of this Section 2.1 (the Cash Purchase Price and the New Vehicle Inventory Amount shall be referred to collectively as the "Purchase Price"). The parties agree that the portion of the Cash Purchase Price attributable to the Real Property is the _See breakdown. Page 3A._

(b)    Purchase Price Adjustments. The Cash Purchase Price may be adjusted for P&A (the "P&A Adjustment") and work-in-process (the "WIP Adjustment") as hereinafter set forth.

(i)    P&A Adjustment. The Cash Purchase Price shall be increased or decreased as the case may be by the amount by which the P&A inventory determined in accordance with Section 5.6 exceeds or is less than

Addendum To Asset Purchase Agreement

2.1a. Total consideration for the business will be determined as follows. Real estate at appraised value plus 5%. Goodwill for the business, $2,000,000.00. Parts and special tools at time of closing after a physical inventory. Seller to carry a promissory note on the balance of money that is due from the $5,500.000.00 that will be wire transferred on the day of sale. Note to be for a period of 5 years with terms to be discussed as to interest rate and security.

2.1b We offer Mr. Morande an employment contract for two years at a salary to be negotiated prior to closing to transfer the business without interruption to the on going day to day affairs.

2.1c The buyer will have the option for six months to acquire the Mazda and Suzuki Franchises and the land as so stated. We will do a joint venture or outright sale at that time. Terms of sale to be determined at that time.

The seller acknowledges that the buyer is working with other franchises to move to that site and that Kia may be moved and replaced with Hummer. It is imperative that the Seller and the Buyer work in complete harmony to accomplish the goals that the buyer is moving to.

The terms of this transaction to be closed once the due diligence of the buyer has been accomplished within 30 to 45 days from the execution of this contract.

(ii) <u>WIP Adjustment.</u> The Cash Purchase Price shall be increased by the cost of parts and labor incurred by Seller in repairing customer vehicles still on hand at Closing. The Seller's work-in-process report shall be determinative of the amount expended on jobs in process.

The Cash Purchase Price, adjusted for the P&A Adjustment and the WIP Adjustment shall hereinafter be referred to as the "Cash Consideration".

(c)   <u>Deposit.</u> Upon execution of a Letter of Intent, Buyer deposited the sum of _____150.000_____ (the "Initial Deposit") which is being held in escrow by _ Mike McOnvaile

with Michael W. McArdle, Esquire ("McArdle") to be held in escrow. (The Initial Deposit and the Second Deposit are hereinafter referred to jointly as the "Deposits" and McArdle are hereinafter referred to jointly as the "Escrow Agents"). The Escrow Agents shall hold the Deposits in interest-bearing money market accounts with interest accruing to Buyer, to be held in such account until Closing or until disposed of as provided elsewhere in this Contract. At Closing (unless a delivery out of escrow specifically permitted in this Agreement has previously occurred), the Deposits and all accrued interest shall be credited for the account of Buyer toward the Cash Consideration. This Agreement shall serve as the escrow agreement and constitutes instructions binding upon the Escrow Agents, Buyer and Seller, subject only to mutually agreed upon supplemental instructions executed by both Buyer and Seller in writing.

(d)   <u>Cash Consideration.</u> The Cash Consideration, less the Deposits and subject to adjustments and prorations as herein provided, shall be payable by wire transfer of cleared federal funds or cash on the Closing Date to McArdle's trust account.

(e)   <u>New Vehicle Inventory Amount.</u> For purposes of determining the Purchase Price, the New Vehicle Inventory Amount shall be equal to the sum of the adjusted Manufacturer's Invoice Cost, as defined hereafter, for new KIA vehicles and the agreed upon purchase price for Used Cars, if any. The adjusted Manufacturer's Invoice Cost for new KIA vehicles shall be calculated as follows:

(i)   the KIA manufacturer's invoice cost of KIA vehicles ("Manufacturer's Invoice Cost");

(ii)   Manufacturer's Invoice Costs shall be increased by the cost of any equipment and accessories that have been installed on new KIA vehicles at the request of customers, subject to substantiation of such customer orders and costs thereof;

(iii)   Manufacturer's Invoice Cost shall be decreased by the cost of any equipment and accessories that have been removed from new KIA vehicles; and,

(iv)   Manufacturer's Invoice Cost shall be decreased by the cost of repairing any damage to new KIA vehicles; provided, however, that Manufacturer's Invoice Cost shall be decreased only by the cost of repairs

(f)   Buyer understands that Seller's inventory of new cars and trucks is 100% financed (the "New Vehicle Inventory Debt") and Seller and Buyer agree that the New Vehicle Inventory Amount shall be paid by Buyer refinancing the New Vehicle Inventory Debt with its financial lender.  Buyer shall have Seller released by lender at Closing from any obligation under the New Vehicle Inventory Debt instruments and shall indemnify and hold Seller harmless from any liability or indebtedness associated with any new KIA cars or trucks acquired by Buyer.

**2.2   Prorations.**  Utility charges, real estate taxes and assessments, both general and special, and similar proratable items which are attributable to the Purchased Assets, including personal property taxes, shall be apportioned between Buyer and Seller.  Any item that relates to the period prior to the Closing Date shall be apportioned to the Seller, and any item which relates to the period on or after the Closing Date shall be apportioned to Buyer.  If applicable, Seller shall receive a credit for any proratable item that has been prepaid by Seller for a period beyond the Closing Date, including, but not limited to any inventoried oil and lubrications.  If the actual *ad valorem* real estate taxes due on the Real Property for the 2004 tax year are more or less than the tax bill used to prorate real estate taxes, the Buyer or Seller, as the case may be, shall be entitled to a re-proration and payment based on such re-calculation.  This provision shall specifically survive Closing.

**2.3   Used Car Inventory.**  Except as may be agreed to in writing by the Buyer and Seller prior to the Closing, the Purchased Assets shall not include any of Seller's used car inventory.  Any used cars acquired by Buyer from Seller shall be at a price to be agreed upon in writing by Buyer and Seller and paid by wire transfer of cleared federal funds or cash to McArdle's trust account at the Closing.

**2.4   Rebates, Discounts, Holdbacks, Refundable Advertising Allowances, Etc.**  All KIA rebates, discounts, holdbacks, advertising allowances and factory incentives related to any new KIA vehicles, whether on hand or in transit, shall belong to Seller if received or receivable by Seller prior to Closing and shall belong to Buyer if paid after Closing.

**2.5   Parts and Accessories.**  KIA P&A will be acquired by Buyer subject to the terms and conditions of the KIA Parts Termination Return Program.  Any refunds or rebates as a result of Seller returning KIA P&A prior to Closing shall belong to Seller.  Any refunds, rebates or invoice adjustments as a result of returning KIA P&A after Closing shall belong to Buyer.  Seller

shall not place any orders for new P&A after the date that is ten (10) days before the Closing Date.

## SECTION III
## REPRESENTATIONS AND WARRANTIES

3.1   **Seller's and J-D-M's Representations and Warranties.**   Seller and J-D-M hereby represent and warrant to Buyer that the following representations and warranties are true and correct as of the date of the execution of this Agreement and the date of Closing hereunder:

(a)   That as of the Closing Date Seller and or J-D-M will have good and marketable title to the Purchased Assets, free and clear of all liens and encumbrances;

(b)   That Seller and J-D-M are corporations duly organized, validly executing, and in good standing under the laws of the State of Florida and have the power and authority to perform their obligations hereunder;

(c)   That no person, firm or entity other than Buyer has any rights in or right to acquire the Purchased Assets or to seek and obtain KIA's consent and approval to operate a dealership at Seller's current location;

(d)   That Seller is not aware of any breach of any law or regulation with respect to the Dealership, the Purchased Assets or the Seller's present or past use and operation of the Dealership at its current location, the effect of which would have a material adverse affect on Buyer's ability to operate the Dealership, including without limitation, the Americans with Disabilities Act, local zoning ordinances, and state and local building codes;

(e)   J-D-M has not received any oral or written notice of (i) proposed special assessments, condemnation, or changes in the roads adjacent to the Real Property; (ii) pending public improvements which will result in any charge being levied or assessed against, or a lien being created upon, the Real Property; or (iii) pending or threatened eminent domain or condemnation proceedings against or involving the Real Property or any adjacent parcel;

(f)   That all requisite corporate action to approve, execute, deliver and perform this Agreement and each of the instruments or other documents to be executed by or on behalf of Seller or J-D-M hereunder will be taken. This Agreement has been duly and validly executed and delivered by Seller and J-D-M and constitutes, and each of the instruments and other documents to be executed and delivered by Seller and J-D-M hereunder, when duly and validly executed and delivered by Seller and J-D-M, will constitute valid and binding obligations enforceable against Seller and J-D-M in accordance with its terms;

(g)    To the best of Seller's and J-D-M's knowledge, there are currently in full force and effect all permits, easements and rights-of-way (including proof of dedication) required by governmental authorities having jurisdiction over the Real Property or from private parties for the normal use, operation, occupancy and maintenance of the Dealership and to insure legally sufficient parking and vehicular and pedestrian ingress to and egress from the Real Property, and consummation of the transaction contemplated herein will not affect any of the same. Seller has not received any notice from any person and has no knowledge or information that there are any defaults or violations with respect to the permits or that any of the permits have not been maintained in full force and effect;

(h)    Seller and J-D-M have no knowledge of any material adverse fact or condition regarding this Agreement, the Dealership, the Real Property or the transaction contemplated herein. In addition, J-D-M has no knowledge or information of any fact that would materially impair the value of the Real Property taken as a whole; and,

(i)    All appropriate public utilities, including without limitation, sanitary and storm sewers, water, electricity, and telephone are currently available.

## SECTION IV
## TITLE EXAMINATION OF REAL PROPERTY

**4.1**   **Title Commitment**. Buyer shall pay the cost of a title search on the Real Property and the owner's title insurance premium at the minimum rate promulgated by the insurance commissioner of the State of Florida for issuance of an owner's title insurance policy.

**4.2**   **Permitted Exceptions**. The Real Property shall be sold, and good and marketable title is to be conveyed, subject to the following described matters (the "Permitted Exceptions"):

(a)    Real estate taxes for the year of Closing and subsequent years, for which a bill has not been rendered as of the Closing Date;

(b)    Zoning and other use restrictions imposed by governmental authority; and,

(c)    Covenants, restrictions and public utility easements of record provided (i) there exists at Closing no violation of the same; (ii) said exceptions do not render title unmarketable; and, (iii) none of them prevent Buyer's intended use of the Property as an automobile dealership.

**4.3**   **Survey of Real Property**. During the Real Property Inspection Period (as defined below in Section 7.1), Buyer may obtain a current "as-built" survey of the Real Property and all improvements located thereon at Buyer's cost, prepared by a licensed surveyor and

certified to Buyer, its attorney, the Title Company, and to any lending institution Buyer may designate.

**4.4    Objections to Title and Survey Matters**.  If the Commitment or Survey shall reflect that Seller's title is subject to matters which render title unmarketable or unsuitable for Buyer's designated use and Buyer shall notify Seller of Buyer's objection(s) to the same in writing thirty (30) days from and after the Effective Date, time being of the essence, the same shall be treated as defect(s) in title ("Review Period").  Unless Buyer delivers written notice to Seller of Buyer's objections to title within the Review Period, it shall be conclusively deemed that Buyer has accepted title to the Real Property in its then existing condition.  Seller shall have five (5) days from and after the receipt of Buyer's objections to notify Buyer whether or not Seller intends to cure any matters timely raised as an objection.  If Seller elects in writing to cure the same, Seller shall have sixty (60) days from and after receipt of Buyer's objections to cure any matters objected to, and Seller agrees that Seller shall use due diligence (including the bringing of any necessary suits) in curing any such matters.  If the Seller does not cure the matter(s) objected to within said sixty (60) day period or if the Seller fails to give timely notice to Buyer of its intention to cure any matters timely raised as an objection, Buyer shall have the option of either:  (i)  closing this transaction in accordance with the terms and provisions hereof and accepting title in its then existing condition; or (ii)  terminating this transaction upon notice to Seller, within fifteen (15) days of the expiration of said sixty (60) day period or receipt of notice from Seller of its intention not to cure matters timely raised as an objection, whereupon the Deposit and all interest accrued thereon shall be returned to Buyer; and Seller and Buyer shall be released from any and all further obligations and liabilities arising under or out of this Agreement.  If Buyer shall fail to terminate this Agreement by giving notice of the same to Seller within (15) days of:  (i)  the expiration of said sixty (60) day cure period; or (ii) receipt of notice from Seller of its intention not to cure matters timely raised as an objection, then it shall be deemed that Buyer has accepted title in its then existing condition and Buyer shall proceed to close this transaction in accordance with the terms and conditions hereof.

## SECTION V
## CLOSING

**5.1    · Closing**.  The Closing of the transactions set forth in this Agreement (the "Closing") shall take place on                         at the offices of Michael W. McArdle, Esq., 711 Fifth Avenue South, Suite 209, Naples, Florida, or on such earlier date or place as may be agreed in writing by the Parties (the "Closing Date").

**5.2    Buyer's Obligations at the Closing**.  At the Closing, Buyer shall deliver to Seller the Purchase Price.

**5.3    Seller's and J-D-M's Obligations at the Closing**.  At the Closing, Seller and or J-D-M shall deliver to Buyer, in form and substance reasonably satisfactory to Buyer:

(a)    A good and sufficient general warranty deed transferring fee title to the Real Property to Buyer;

(b)    A Bill of Sale with full warranties of title transferring the Personal Property to Buyer;

(c)    A "non-foreign affidavit" in the form and substance satisfactory to Buyer;

(d)    An owner's gap and mechanics' lien affidavit in the standard customary form;

(e)    Such evidence of the authority and capacity of Seller to execute and deliver this Agreement and the documents required to consummate the transactions contemplated hereunder as Buyer's counsel may reasonably determine; and,

(f)    Such other deeds, bills of sale, endorsements, assignments, affidavits, and other good and sufficient instruments of sale, assignment, conveyances, and transfer, with general warranty covenants and in form and substance satisfactory to Buyer, as may be reasonably required by Buyer's counsel including, without limitation, those documents needed to effectively vest in Buyer good and marketable title to all of the Purchased Assets free and clear of any and all liens, claims, conditions, easements, reservations and encumbrances.

**5.4    Removal of Seller's Assets.**    Buyer agrees that Seller shall have three (3) business days after Closing to remove any retained assets, including its Used Car Inventory, from the acquired premises.

**5.5    Discharge of Existing Encumbrances.**    If Seller fails to properly satisfy or release any mortgage, lien, or other encumbrance prior to Closing, the necessary portion of the Purchase Price due Seller at Closing shall be paid to the holder(s) of such mortgage(s), lien(s) or other encumbrances in order to satisfy or release the same. Seller represents and warrants that such mortgage, lien or encumbrance does not contain any provision that would prohibit the satisfaction or release of the same at Closing.

**5.6    Inventory of Assets.**    Buyer and Seller shall conduct a physical inventory of the Assets within forty-eight (48) hours of Closing and a detailed list of the Assets shall be attached as exhibits to any Bills of Sale, Assignments or other documents of conveyance. Buyer and Seller shall each pay one-half (1/2) of the cost of the physical inventory.

**SECTION VI**
**ADDITIONAL CONDITIONS PRECEDENT**

**6.1    Conditions Precedent.**    Each and every obligation of the Buyer hereunder to be performed at or before Closing shall be subject to the satisfaction at or before Closing (or such earlier date as may be specified below) of the following conditions (unless waived by the Buyer):

(a)    On the Closing Date, the Seller shall have performed all of the undertakings, agreements and covenants to be performed by Seller hereunder on or before the Closing Date;

(b)    The acceptance and approval of Buyer as a dealer-franchisee by and for KIA with respect to the Dealership and the KIA Franchise. Seller shall make immediate proper application to KIA to request approval of the transfer of the KIA Franchise from Seller to Buyer. Buyer shall cooperate with Seller to obtain approval of the transfer of the KIA Franchise;

(c)    The execution by Seller of any and all necessary documents that may be required for the resignation of the KIA Franchise, conditioned upon Buyer being granted the same franchise;

(d)    The approval of the present Dealership sales and service facilities by KIA;

(e)    No damage, loss, casualty or destruction, whether covered by insurance or not, shall have occurred which materially and adversely affects any material portion of the Purchased Assets;

(f)    All consents and/or Lien releases by third parties that are required for the transfer of the Purchased Assets free and clear of liens or that are required for the consummation of the transactions contemplated hereby shall have been obtained or provided for;

(g)    Seller will make available for Buyer to inspect Seller's files and copies of the following as may be in Seller's possession and/or control for a period of time commencing on the Effective Date and terminating thirty (30) days thereafter:

    (i)    any existing contracts, permits, building plans and specifications, and, licenses, if any, relating to the Real Property;

    (ii)    any correspondence between Seller and any governmental agency or adjacent property owner or association;

    (iii)    all development orders and other agreements with public or private authorities relating to zoning or the use of the Real Property, and all reports, petitions and studies, unused or otherwise, related thereto, or provided to any governmental instrumentality or any documents received from or pertaining to any governmental agency that may affect the Real Property.

    (iv)    financial information pertaining to the KIA assets and sales for the current calendar or fiscal year, as applicable; each of the previous three calendar or fiscal years, as applicable;

(v)     written estoppel letter(s) from the holder(s) of any existing mortgages confirming the amount which will be required to be paid on the Closing Date in order to release or satisfy such mortgage(s); and,

(vi)     a current U.C.C. encumbrance search.

(m)     All of Seller's representations and warranties contained in Section 3 of this Agreement shall have been true and correct in all material respects when made and shall be true and correct in all material respects as of the Closing Date.

## SECTION VII
## INSPECTIONS

**7.1     Real Property Inspection**. Buyer shall have thirty (30) days from the Effective Date to conduct, at Buyer's expense, engineering, feasibility and such other studies and investigations concerning the Real Property, as Buyer desires (the "Real Property Inspection Period"). During the Real Property Inspection Period, the Buyer and its agents shall be provided reasonable access to the Real Property. Should any current Phase I Environmental Audit of the Real Property recommend additional environmental audits or tests of the Real Property, the Buyer shall pay for any such additional recommended audits or test, including, but not limited to, a Phase II Environmental Audit.

**7.2     Personal Property**. Buyer is purchasing the Personal Property "AS IS", without reliance on any warranty or representation, express or implied, made by Seller or any of Seller's agents, employees or representatives.

## SECTION VIII
## DISCHARGE OF OBLIGATIONS/INDEMNIFICATION

**8.1     Seller's Breach of This Agreement**. Seller agrees to indemnify and hold Buyer and its officers, directors, agents, representatives, and employees harmless for any loss suffered by virtue of Seller's breach of any warranty or representation of this Agreement or violation of any terms or material condition of this Agreement.

**8.2     Events or Conditions Prior to Closing**. Seller shall indemnify Buyer, and any shareholder, officer, director, agent, representative or employee of Buyer against any and all loss, liability and expenses, including attorney's fees, resulting from or arising out of any suit, judgment, lien or other claim or action brought or made against Buyer or any party which is based in whole or in part on events or conditions occurring or existing in connection with, or arising out of, the business operated by the Seller or the ownership, possession, use or sale of the Purchased Assets by the Seller prior to the Closing Date.

**8.3     Buyer's Breach of This Agreement**. Buyer agrees to indemnify and hold Seller and its officers, directors, agents, representatives, and employees harmless for any loss suffered

11

by virtue of Buyer's breach of any warranty or representation of this Agreement or violation of any terms or material condition in this Agreement.

**8.4    Events or Conditions Subsequent to Closing**.  Buyer shall indemnify Seller, and any shareholder, officer, director, agent, representative or employee of Seller, against any and all loss, liability and expenses, including attorney's fees, resulting from or arising out of any suit, judgment, lien, or other claim or action brought or made against Seller or any party which is based in whole or in part on events or conditions occurring or existing in connection with, or arising out of, the business operated by the Buyer or the ownership, possession, or use of the Purchased Assets by the Buyer subsequent to the Closing Date.

**SECTION IX**
**ADDITIONAL PROVISIONS**

**9.1    Continuation of Business Pending Closing**.  During the period from the date hereof to the Closing Date, unless Buyer shall have given its consent thereto, Seller will not:

(a)    Enter into any contracts or commitments except in the ordinary course of business;

(b)    Waste any of the Purchased Assets; or,

(c)    Modify, amend or terminate any existing agreement relating to the Purchased Assets.

**9.2    Buyer's Access**.  Until the Closing, a representative of Buyer, upon reasonable advance notice to Seller, may inspect the Dealership premises after business hours.

**9.3    Employees**.  Buyer is not obligated to hire any of Seller's current or former employees and Buyer shall not be liable to continue the employment of any employee or to continue any benefit or profit-sharing program which may be in effect as of the Closing Date. Any profit-sharing monies, vacation compensation or other benefits due employees from Seller shall be the sole responsibility of Seller.   Seller also warrants that there are no unionized employees on its payroll.  Buyer shall not be liable for the payment or continuation of any other form of wages or Compensation, unemployment benefits, or any COBRA rights relative to any past or current employees of Seller.  Seller shall not be responsible for the decision of any employee or employees whether to accept employment with Buyer after Closing.

**9.4    Risk of Loss**.  Prior to the Closing Date, Seller shall bear the risk of loss with respect to any damage or loss to the Purchased Assets, including, without limitation, the taking or proposed taking of the real Property, or any portion thereof, by eminent domain, condemnation or otherwise, or casualty to the Real Property such as a fire, sinkhole, wind damage or otherwise, and any other damage or loss to the Assets.  In the event of the occurrence of any such casualty, taking or other material loss to the Purchased Assets, Seller shall, at Closing, pay or assign over to Buyer any insurance proceeds, any other proceeds received by or

12

to be received by Seller, claims or other rights of the Seller on account of damage or loss to the Purchased Assets or repair or replace such damaged or lost Purchase Asset(s).

**9.5    Termination.** Either Buyer or Seller may terminate this Agreement, and the transactions contemplated herein will not be consummated, if any of the following events involving either party occurs prior to or at the Closing:

(a)    The filing of a voluntary or involuntary petition in bankruptcy as to either party;

(b)    The appointment of a receiver, custodian or trustee for either party;

(c)    The filing of an execution, assignment for the benefit of creditors, insolvency petition, arrangement or reorganization by or against either party;

(d)    If there has been a material misrepresentation or breach of a warranty or covenant; or

(e)    If consummation of the transactions contemplated hereby would violate any nonappealable final order, decree, or judgment of any court or governmental body having competent jurisdiction.

**9.7    Notices.**  Any notice required hereunder to be made upon a party hereto shall be deemed made when sent to the other party by registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

To Seller:    James A. Morande, Jr.
5180 Old Gallows Way
Naples, FL  34105

With a copy to:    Michael W. McArdle, Esq.
711 Fifth Avenue S., Suite 209
Naples, FL  34102

To Buyer:    Richard Cirami
339 Mill River Rd.
Oyster Bay N.Y. 11771

With a copy to:

13

The foregoing addresses may be changed from time to time by notifying the other parties of such change in the manner described herein.

**9.8    Assignment and Benefit.** The parties hereto are prohibited from assigning any of their rights or obligations under this Agreement without the written consent of the other party, which consent shall not be unreasonably denied. It is understood that, without the approval of Seller, Buyer may assign rights and obligations under this Agreement to a related entity formed or to be formed by Buyer for the purpose of holding title to some or all of the Purchased Assets and/or operating the Dealership. Subject to the foregoing, this Agreement shall inure to the benefit of and be binding upon the successors, heirs, administrators, executors or assigns of the parties hereto.

**9.9    Governing Law.** This Agreement shall be interpreted under the laws of the State of Florida and the venue for any dispute arising under or relating to this Agreement shall be Collier County, Florida.

**9.10    Non-Waiver.** The waiver by any party of any breach or any default of any covenant, condition, or provision hereof shall not be construed as a waiver of any subsequent breach or default.

**9.11    No Present Assignment.** This Agreement does not constitute a present sale and/or assignment of Seller's franchise agreement with KIA.

**9.12    Confidentiality.** Buyer and Seller agree that until Closing is complete, or in perpetuity if Closing does not occur, the Parties, including their employees and associates, shall keep confidential all data and information obtained with respect to the Seller, the Buyer, the respective business of each party, and information pertaining to the transaction contemplated by this Agreement, and Seller shall not list the Assets with any broker, solicit or make or accept any offers to sell the Assets or engage in any discussions or negotiations with any third party with respect to the sale or disposition of the Assets. Buyer and Seller shall not inform their employees of the terms of this Agreement until after KIA's approval of the transfer is obtained; provided, however, Buyer and Seller shall be permitted to inform such employees of the terms of this Agreement as are necessary in order to complete the requirements hereunder.

**9.13    Survival.** The representations, covenants and warranties provided in this Agreement shall not be merged in and shall survive the Closing of the Agreement.

**9.14    Further Assurance.** The parties hereto specifically agree to take whatever additional action and to execute all additional documents as shall be reasonably necessary to complete the closing of the sale of the Purchased Assets, to evidence the transfer of the Assets to Buyer, and to fulfill any of their other obligations hereunder, providing, however, that the same shall not increase the liability or obligations of either of the parties to this Agreement.

9.15   **Capacity of Escrow Agent**.  The Escrow Agents are representing the parties in regard to the closing of the subject transaction.  Both parties recognize and acknowledge           is counsel for the Buyer and McArdle is counsel for the Seller and may continue to represent the Buyer and Seller, respectively, in this and any other transaction or matter including, without limitation, representation in disputes between or among Buyer, Seller and any lender, and disputes concerning the Deposits and disputes concerning the Escrow Agents' responsibilities hereunder.

9.16   **Limitation of Escrow Agent's Liability**.  The Escrow Agents shall not be responsible for any defaults hereunder by any party.  The Escrow Agents may consult with counsel of their own choice and shall have full and complete authorization and protection for any action taken or suffered by Escrow Agents hereunder in good faith and in accordance with the opinion of such counsel.  In the event of actual or potential dispute as to the rights of the parties hereto under this Agreement, the Escrow Agents may continue to hold the Deposits until the parties mutually agree to the release thereof, or until a judgment of a court of competent jurisdiction shall determine the rights of the parties thereto, or it may deposit any monies and all instruments held pursuant to this Agreement with the Clerk of Court, Collier County, Florida, and upon notifying all parties concerned of such action, all liability on the part of the           and or McArdle shall terminate, except to the extent of an account of any monies improperly delivered out of escrow.

9.17   **Escrow Agent Resignation & Replacement**.  The Escrow Agents may resign upon thirty (30) days written notice to the parties to this Agreement.  If a successor Escrow Agent is not appointed within said thirty (30) day period, Escrow Agent may petition the appropriate court to name a successor.

9.18   **Radon Gas**.  Buyer acknowledges and understands that radon is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time and that levels of radon that exceed federal and state guidelines have been found in buildings in Florida.

## SECTION X
## TERMINATION AND DEFAULT

10.1   **Permitted Termination**.  If this Agreement is terminated by either party pursuant to a right expressly given it to do so hereunder (herein referred to as a "Permitted Termination"), the Deposit and all interest accrued thereon shall immediately be returned to Buyer and neither party shall have any further rights or obligations hereunder.

10.2   **Default by Buyer**.  If Buyer defaults in the performance of any of Buyer's material obligations, covenants or agreements contained in this Agreement, for any reason other than a default by Seller or a Permitted Termination hereunder, then Seller may, at its option, do any of the following:

(a)    Terminate this Agreement by written notice to Buyer prior to Closing, and in such event, the Deposit and all interest accrued thereon shall be delivered to Seller;

(b)    Seller shall be entitled to bring an action against Buyer for specific performance; and/or,

(c)    Seek any other remedy which Seller may be entitled under Florida law.

The provisions of this Section 10.2 shall specifically survive the termination of this Agreement.

**10.3**    **Default by Seller**.  Seller shall be in default hereunder upon the occurrence of any one or more of the following events:

(a)    Any of Seller's warranties or representations set forth herein are or shall be untrue or inaccurate in any material respect, and the circumstances causing such representation or warranty to be untrue or inaccurate shall not be immediately corrected by Seller after notice of same;

(b)    Seller shall fail to meet, comply with or perform any covenant, agreement, or obligation required; within the time limits (time being of the essence), and in the manner required in this Agreement, for any reason other than a Permitted Termination.

The provisions of this Section 10.3 shall specifically survive the termination of this Agreement.

**10.4**    **Buyer's Remedies**.  In the event of a default by Seller hereunder, Buyer may, at its option, do any of the following:

(a)    Terminate this Agreement by written notice delivered to Seller prior to Closing and, in such event, the Deposit and all interest accrued thereon shall be returned to Buyer;

(b)    Buyer shall be entitled to bring an action against Seller for actual damages or specific performance; and/or,

(d)    Seek any other remedy which Buyer may be entitled to under Florida law.

The provisions of this Section 10.4 shall specifically survive the termination of this Agreement.

**10.5**    **Tax Allocation of Purchase Price**.  The parties agree that the Purchase Price shall be allocated for federal income tax purposes in accordance with the allocation set for on Schedule 10.5 attached hereto and made a part hereof.  The parties agree to cooperate with each other in the preparation of any forms required to be filed with a federal income tax return, including, but not limited to and forms required to be filed pursuant to Section 1060 of the Internal Revenue Code of 1986 or the Treasury Regulations thereunder.

16

THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK

_____
Agreed to James A. Morande

_____
Richard A. Cirami

_____
Gary Dear

# EXHIBIT D

# AGREEMENT TO PURCHASE AND SELL

Entered into on the _____ day of March 2004, by and between **Richard A. Cirami, 339 Mill River Road, Oyster Bay, NY 11771, Gary Dear, 16022 Laurel Creek, Delray Beach, FL 33446, Automotive Investments, Inc.,** hereinafter referred to as "BUYER" AND **Gaylon T. Peters, Island Ford-Lincoln-Mercury, 1230 Fording Island Road, Bluffton, SC 29910** (including collision center and mini-storage at 50 Burnt Church Road), hereinafter referred to as "SELLER".

SELLER AND BUYER AGREE TO THE FOLLOWING:

I.  SELLER has the authority from all stockholders and the Board of Directors to sell certain assets of Island Ford-Lincoln-Mercury. SELLER agrees to sell and BUYER agrees to purchase certain assets, with the understanding that the general terms found herein will be incorporated into a formal Asset Purchase Agreement to be executed by both parties at a later date, as soon as possible after the execution of this Agreement to Purchase and Sell; but not later than the _____ day of _____ 2004. Time is of the essence. BUYER'S obligation to close will be conditioned upon BUYER'S and SELLER'S attorney and acceptance of the formal Asset Purchase Agreement.

   A.  Island Ford-Lincoln-Mercury real estate, that is, all land improvements known as Island Ford-Lincoln-Mercury. **BUYER agrees to lease real estate for $38,00.00 per month for fifteen (15) years with a rent increase of ten percent (10%) every five (5) years. BUYER will have the option to purchase the land and buildings for $6,800,000.00 at the end of the fifteen (15) year term.**

   B.  Certain furniture, fixtures, office equipment, shop equipment special tools, existing computer equipment, software, telephone systems (if owned by SELLER) and signs (if owned). SELLER will provide a complete inventory list of these assets to the satisfaction of BUYER. Existing leases of any equipment or signs will be assumed by BUYER.

   C.  (1) Parts and accessories that are new, remanufactured, unused at manufacturer's current replacement cost to a franchised dealer less any special discounts.
      (2) All miscellaneous nuts, bolts, etc. at replacement cost.
      (3) All oil and grease at replacement cost.

   D.  Franchises that are currently held by Island Ford-Lincoln-Mercury (Ford, Lincoln and Mercury) BUYER will pay to SELLER for franchise rights and/or other considerations to be determined in the Asset Purchase Agreement, but which may take the form of payments for customer sales lists, customer service lists, non-compete agreements, management and/or consulting agreements or the like with a value of **Four Million Two Hundred Thousand and no/100 dollars ($4,200,000.00 )** in a manner acceptable to both BUYER and SELLER.

   E.  (1) All new 2003 and 2004 vehicles at dealer's cost less any rebates or holdback. Any damage must be repaired or have allowances deducted for any repairs to be made unless covered by warranty or transportation damage coverage. Any dealer installed parts or accessories are to be added to dealer cost at dealer cost.
      (2) All 2003 and 2004 demonstrator cars having less than 6,000 miles at dealer's actual cost less any rebates or holdback. Any damage must be repaired or have allowances deducted for any repairs to be made unless covered by warranty or transportation damage coverage. Any dealer installed parts or accessories are to be added to dealer cost at dealer cost.
   F.  Used cars are available for purchase if BUYER and SELLER can agree on a price.

The purchase price of the assets, exclusive of the vehicles described in Paragraph **E** shall be approximately as **Five Million Six Hundred Sixty Five Thousand One Hundred Forty Nine and no/100 dollars ($5,665,149.00)** and may be allocated as follows:

| | | |
|---|---|---|
| Paragraph A - Real Estate | A | $ lease (as per paragraph A above) |
| Paragraph B - Furniture, Fixtures, Equipment, etc. | B | $   916,700.00 |
| Paragraph C - Parts and Accessories (+ or - subject to count) approximately | C | $   408,156.00 |
| Paragraph D - Franchise Rights and other considerations | D | $ 4,200,000.00 |
| Paragraph F - Used Cars | F | $ optional |
| **TOTAL** (exclusive of New Vehicles and Demonstrators) | | **$ 5,665,149.00** |

**Copyright © [2003] Gordon Page & Associates, Inc. All rights reserved. / Gordon Page Enterprises**
P.O. Box 262858 • Tampa, Florida 33685-2858 • (813) 854-4022 • Fax (813) 854-2660 • Toll Free (877) CAR-PAGE • www.gordonpage.net

To: Gordon Page and Richard Cirami.                    April 23, 2004

This is in response to your letter April 18, 2004 proposal. I have tried to make your proposed numbers work, but it's very difficult to lower the figures below any further after talking to my accounting firm. The tax on the LIFO recapture and my over-all tax liability is much more than I anticipated. The following numbers are the best I can do.

Real Estate Purchase:
The purchase price for the main building, two service buildings, approximately 5.6 acres located at 1230 Fording Island Road and a collision center and mini storage business with approximately 1.6 acres at 50 Burnt Church Road will be sold by averaging two separate M.A.I. appraisals: One appraisal by you and one chosen by me. If the appraisal on the real estate differs by more than 15%, seller may elect to obtain a third appraisal to arrive at a final value for the property.

Fixed Assets: Based on the following formula:
The Furniture, Fixtures, Equipment will be sold at current asset cost ( March statement showed $972,000.) line 40 page 1 of the Ford Motor Company Dealer Financial Statement less the following depreciation allowance: Purchases: January, 2002-May, 2004 -10%
                          January, 2000- December, 2001 - 20%
                          1999 and prior - 30%

The Parts and Accessories is approximately $400,000. Subject to Parts accounting audit and count is acceptable.

Goodwill and other considerations of $4,200,000., is acceptable.

New Vehicle Inventory: We need to discuss the hold-back, advertising allowances, etc.. I, of course, should not have any gains in these accounts, but I certainly don't want to lose any cash either.

I would like the transfer of Ownership/ Management to be effective August 1, or September 1, 2004. My annual parts inventory audit is always scheduled in June but I will push that back if we can get all of the approvals completed.

After discussing this with my accounting firm, I still would not be interested in taking back a note on any balance except for the real estate. If you decided to mortgage the real estate, I would need 20% down and would finance the balance over 20 years at 8 ½ % .

Factory approval and a documented and fully funded closing would need to be consummated before any manager or new owner or any other employee could enter or start employment at the dealership.

Richard, I really appreciate the offer for me to stay involved, but once I have made the decision

cc. Vawter, Gammon, Norris & Company
    Certified Public Accountants

# EXHIBIT E

II. This agreement to purchase and sell is subject only to the manufacturer's/importer's/distributor's (Ford, Lincoln and Mercury) approval. Time is of the essence. Upon execution of a formal Buy-Sell Agreement, SELLER will immediately apply to factory approval and immediately provide all required information and documentation to the manufacturer/distributors (Ford, Lincoln and Mercury).

III. SELLER must provide BUYER with a clear bill of sale and comply with the South Carolina Bulk Sales law, if applicable. Purchase is also subject to environmental matters concerning real estate, including inspection, correction, and compliance per state and federal laws.

IV. BUYER agrees to enclose a check for **Two Hundred Thousand and no/100 dollars ($200,000.00)**. Said funds shall be for an earnest money deposit and shall be deposited in the Coastal Bank of Georgia (Brunswick, Georgia) escrow account of James A. Bishop (The Bishop Law Firm, IOLTA Account #924 774), a professional service corporation, the Escrow Agent.

V. Upon acceptance of this offer by SELLER and receipt of the above mentioned deposit in the escrow account of attorney James A. Bishop, the SELLER will immediately have its attorney draft a formal Buy-Sell Agreement for approval and execution by all parties. Upon acceptance of this offer, BUYER will deposit an additional **Two Hundred Thousand and no/100 dollars ($200,000.00)** in the James A. Bishop escrow account. The balance of the purchase price will be paid at closing or occupancy, whichever occurs first. Funds will be cash, cashier's check or wire transfer.

VI. BUYER and SELLER acknowledge that each may owe a brokerage fee to Gordon Page Associates, Inc. in connection with the sale of these assets. BUYER and SELLER further warrant that no other brokerage fee is owed by either party, and each party agrees to indemnify the other against a claim for brokerage fees by any other broker than Gordon Page Associates, Inc., including attorney fees, which may be required to defend against such claim.

BUYER owes seven percent (7%) or seventy five thousand dollars ($75,000.00), whichever is greater, of the sales price (exclusive of the vehicles described in Paragraph E) due and payable at closing or occupancy, whichever occurs first. SELLER owes a fee previously agreed upon, payable at closing or occupancy, whichever occurs first. This paragraph (VI) shall be included in any other form of Buy-Sell and the calculated fee owed to Gordon Page Associates, Inc. shall be included in the closing documents. No closing or occupancy will take place, unless these fees are paid at closing or occupancy, whichever occurs first and are paid in cash, cashier's check or wire transfer.

VII. This offer to purchase is good until _____ _____ 2004, 4:00 PM Eastern time.

SIGNED AND AGREED TO, this the ___9___ day of April 2004,

BUYER: AUTO INVESTMENTS, INC.

BY: _____
Richard A. Cirami

BY: _____
Gary Dear

BY: _____
(WITNESS)

SELLER: ISLAND FORD-LINCOLN-MERCURY

BY: _____
Gaylon T. Peters, President

BY: _____
Gaylon T. Peters

BY: _____
(WITNESS)

Copyright © [2003] Gordon Page & Associates, Inc. All rights reserved. / Gordon Page Enterprises
P.O. Box 262858 • Tampa, Florida 33685-2858 • (813) 854-4022 • Fax (813) 854-2860 • Toll Free (877) CAR-PAGE • www.gordonpage.net
GTP 1-20-81-APS / Rev. 4-15-03

I, Gary Dear give you, Richard Cirami full authority to disperse and control the funds to buy a dealership. You have full authority to move funds from any account where we have put a deposit to any other account you deem necessary.

Dated this day of  April 8, 2004



Signed by Richard Cirami
        Gary-Dear